**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**BECKLEY DIVISION**

| | | |
|---|---|---|
| CAROLYN DIANA DAVIS, | ) | |
| as the Administratrix for the ESTATE of | ) | Civil Action No. 5:18-cv-00530 |
| CHARLES TIMOTHY DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | Judge Berger |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**AMENDED COMPLAINT**

AND NOW comes the Plaintiff, Carolyn Diana Davis, as Administratrix of the Estate of Charles Timothy Davis, by and through undersigned counsel, and in response to the Motion of the United States to Dismiss, hereby files pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure her Amended Complaint against Defendant The United States ("United States"), pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), alleging and stating as follows:

**INTRODUCTION**

1.      On April 5, 2010, Plaintiff's husband, Charles Timothy Davis, was killed in a massive explosion at the Upper Big Branch Mine—South ("UBB Mine") then operated by Performance Coal Company, a sub-subsidiary of the Massey Energy Company and subject to mandatory safety inspections to be performed by employees of Defendant's Mine Safety and Health Administration ("MSHA").

2.      Subsequently, Plaintiff, before the one-year anniversary of the explosion, and pursuant to the requirements of the Federal Tort Claims Act ("FTCA"), 28 USC §

2671 *et seq.*, filed an administrative claim on behalf of her husband's estate with the Department of Labor ("DoL").

3.      More than six (6) years later, on October 19, 2017, the United States denied the claim.  A copy of the letter denying the claim is attached hereto as Exhibit "A".

4.      With the passage of so much time, Plaintiff Davis misplaced her copy of the claim document she originally submitted to the DoL.  In evaluating her case prior to bringing the present action, Plaintiff, through counsel, asked that DoL kindly provide her with a copy of her original claim document.  Sadly, the DoL never timely responded to this simple request before the six-month limitations for the filing of her FTCA claim upon the DoL's denial of the six-year-old claim.  *See* Exhibit A.

## PARTIES

5.      Plaintiff, who resides at 221 Delung Lane, Scarbro, Fayette County, WV, is the duly appointed Administratrix of the estate of her late husband, Charles Timothy Davis.

6.      Defendant, the United States, is a sovereign state.  Liability for the acts described herein is based on actions of agents and employees of MSHA, an agency of the United States, for which sovereign immunity is waived under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq*.

## JURISDICTION AND VENUE

7.      This Court may properly exercise original jurisdiction over the parties and the subject matter of this action pursuant to 28 U.S.C. § 1346(b)(1), 28 U.S.C. § 1331, and 28 U.S.C. § 2674.

8.      Venue is properly laid in the Southern District of West Virginia, Beckley Division, pursuant to 28 U.S.C. § 1402(b).  The events and the acts complained of giving rise to this action occurred within Raleigh County, in this District, and the Plaintiff resides in this District.

9.      West Virginia law applies to this action.

10.     As noted in Paragraph 2, Plaintiff has exhausted the administrative requirements set forth in 28 U.S.C. § 2675, by submitting Form SF-95, Claim for Damage, Injury, or Death to the United States Department of Labor, Council for Claims and Compensation, Office of the Solicitor of Labor, 200 Constitution Avenue NW, Suite S4325, Washington, DC 20210, by the statutory deadline for doing same, which claim the United States denied on or about October 19, 2017, as set forth in Exhibit A.

## BACKGROUND

11.     At approximately 3:00 p.m. on April 5, 2010, as a shift change was taking place, a blast ignited at the tail of the UBB Mine longwall operation.

12.     The blast resulted when the longwall's shearer, cutting into sandstone, sent sparks into a pocket of methane that had accumulated over the preceding Easter weekend.

13.     The resulting fireball then travelled to the tailgate area of the longwall, setting off massive explosions of accumulated coal dust, an explosion that ripped through more than two miles of the mine workings.

14.     A total of twenty-nine coalminers died in the explosion.

15.     Charles Timothy Davis was one of four bodies later discovered by mine rescue team members in the headgate entry to the longwall.

## MSHA'S ROLE IN THE EXPLOSION

16.     The Governor's Independent Investigation Panel ("GIIP") appointed by then-Governor Joe Manchin and led by former MSHA Assistant Secretary of Labor J. Davitt McAteer assigned four specific failures to MSHA's role in the explosion.

17.     First, per the GIIP Report, "The Upper Big Branch Mine was a gassy mine … subject to special spot inspections … [and] had experienced at least three major methane-related events. …  All took place in the longwall mining sections."  GIIP Report, at p. 78.

18.     "MSHA's responsibility, as the watchdog, was to recognize [these methane-related events] as evidence of hazards unique to this mine … that warrant special precautions.  However, officials in MSHA's Mount Hope district office did not compel (or to our knowledge even ask) UBB management to implement those recommendations.  Senior officials in the Mount Hope office couldn't explain why no action was taken, but agreed in retrospect that the methane outbursts … were extraordinary events deserving special attention.  *** If MSHA has knowledge, data or evidence that a mine operator does not take all necessary precautions to protect miners' safety, MSHA *must* step in."  GIIP Report, at p. 78 (emphasis original).

19.     Informative of this issue is the statement MSHA investigator Keith McElroy gave to the Federal Bureau of Investigation ("FBI") on September 28, 2015, in which he described the state of the long wall shearer and sprays at the time of the explosion:

> MCELROY [sic] advised that the UBB longwall shearer and sprays were examined thoroughly.  MCELROY could see in the cutter drum that sprays were missing.  Later it was determined during the inspection other sprays and a spray block were missing from the cutter drum.  ** MCELROY advised that the

missing sprays robbed the rest of the system of water. *** MCELROY added that you could still run the shearer with the sprays missing. *** MCELROY determined that even if the shearer had been operating with all of its sprays, the investigation determined that the shearer could not have obtained [the required] 90 psi. *** Water sprays are used to cool the motor, control dust, cool the bits, and reduce methane that might form around mining bits. *** The longwall shearer was using counterfeit sprays. The sprays were being used at the wrong angle. *** MCELROY saw slag and creek sediment in the drums and the stopped up sprays. *** MCELROY stated that the fire suppressant system had been disassembled [sic] was not being used. *** MCELROY advised there were no signs of fragments found that would have indicated the sprays had been ripped out of the shearer because of the explosion.

20.    Second, per the GIIP Report, "In the seven months leading up to the disaster … UBB Management submitted to MSHA more than 40 revisions to the mine's ventilation plan. *** MSHA managers and ventilation specialists recognized the precarious nature of UBB's ventilation system, particularly after the longwall section started in September 2009." GIIP Report, at pp.78-79.

21.    Stating that MSHA ignored numerous "red flags" regarding the UBB ventilation system, the GIIP Report concluded that "MSHA is charged with doing more than reviewing plans, inspecting mines and writing citations and investigation reports. MSHA inspectors, with the guidance of their supervisors and engineering experts, must use their independent eyes to integrate information and see the cumulative effect of all the safety lapses and to develop a comprehensive enforcement strategy that includes special attention to those operators who skirt the bounds of safe operations." GIIP Report, at p. 82.

22.    At least one MSHA inspector, Ms. Bobbie Pauley, who suffered an MSHA demotion for having admitted to giving "advance notice" while still employed by Massey Energy, described her own efforts to advise MSHA of the ongoing ventilation issues at UBB:

PAULEY advised that she called an MSHA office and was transferred to a male. PAULEY told him that she was placing a call about the UBB#1 section and that she was the wife of a miner who worked at the mine. PAULEY told the male that there was not any air on the section and that someone was going to get killed. The individual informed PAULEY that she had called the wrong MSHA office but that he would pass the information along to the Mt. Hope office. PAULEY told BOONE PAYNE that they would have a mine inspection at the mine after she made the call. PAULEY learned from PAYNE that a mine inspector never showed. PAYNE informed PAULEY that he had called MSHA's toll free number, however PAYNE did not go into any detail.

23.     According to the FBI interview report, Ms. Pauley, who apparently left UBB to become an MSHA inspector, "just got promoted by MSHA. PAULEY [sic] took a demoted position after she testified in the ELBERT STOVER trial. PAULEY understood being moved from enforcement because she had given advance notice while working for Massey Energy Company (Massey). PAULEY does not understand why she was demoted."

24.     Third, per the GIIP Report, "Nearly all U.S. coal mine operators, including Massey Energy, rely solely on MSHA to sample the rock dust in all of their mines and to determine whether they have a sufficient percentage of incombustible content.

25.     "An MSHA inspector is expected to collect samples of deposited dust in an underground mine at least during each quarterly inspection and additionally 'when any doubt exists concerning adequacy of rock dust applications in the active working sections.'"

26.     "This practice of rock-dusting is particularly troubling because for more than 20 years, government researchers … and MSHA have studied and subsequently developed  … [the] coal dust explosibility meter (CDEM)." GIIP Report, at p. 82.

27.     However, "no form of [the CDEM] is being used in U.S. coal mines." GIIP Report, 82.

28.     Per the GIIP Report, responsibility for that sad fact rests squarely with MSHA: "The Mine Act places … a duty[] on MSHA to 'develop, promulgate and revise as may be appropriate, improved mandatory health or safety standards for the protection of life and prevention of injuries in coal mines …."  GIIP Report, at p. 83.

29.     Despite the fact that "The Mine Act is considered a 'technology forcing' statute, meaning that MSHA has the authority to use regulatory action to spur technological change' [and that] … [t]he CDEM is fully developed, field-tested and has proved completely capable of doing the job for which it was designed[,] … no action – regulatory or non-regulatory – has been taken to compel the industry to adopt the devices."  GIIP Report, at p. 83.

30.     Finally, per the GIIP Report, "The ultimate failure of MSHA at UBB … was the agency's inability to see the entire picture, the inability to connect the dots of the many potentially catastrophic failure taking place at the mine – especially the mine operator's failure to properly ventilate the mine, to control methane, to apply sufficient amounts of rock dust."  GIIP Report, at p. 83.

31.     In addition, the United States' own Independent Panel Assessment of An Internal Review of MSHA Enforcement Actions at the Upper Big Branch Mine South (the "IPA") found fault with the agency's inspection efforts—or lack thereof—prior to the explosion.

32.     The IPA specifically considered whether: "If MSHA's UBB enforcement performance had consistently and timely enforced the Mine Act and its applicable regulations, could it have prevented or minimized the explosion?"  In answering that question, the Independent Panel Assessment found that "there were three concurrent,

critical events that directly led to the explosion" and that there were, correspondingly, "three opportunities to prevent or minimize the explosion."  IPA, at p. 7.

33.     The IPA concluded that MSHA failed to adequately perform its duties at UBB, and that this failure had a causal relationship to the explosion.  Sections 2 ("Preventing a Fuel Source for the Initial Gas Explosion"), 3 ("Preventing the Dust Explosion") and 4 ("Conclusion") are particularly relevant.

34.     By way of example, with respect to preventing a fuel source for the initial gas explosion, the IPA states: "if MSHA enforcement personnel had completed their **required** enforcement actions during at least one of the four inspections, it is less likely that a roof fall would have occurred.  The airflow would not have been reduced as a consequence.  With the proper quantity of air, there would not have been an accumulation of methane, thereby eliminating the fuel source for the gas explosion." IPA, at p. 8 (emphasis supplied).

35.     Additionally, with respect to preventing the dust explosion, the IPA "concludes that if MSHA enforcement personnel had taken appropriate enforcement actions during the inspections in the months prior to the explosion, either dangerous accumulations of explosive coal dust would have been rendered inert, or the mine would have been idled.  In short, even if there had been a gas explosion, it would have lacked sufficient fuel to trigger a massive dust explosion."  IPA, at p. 9.

36.     Furthermore, commenting upon the interviews with MSHA inspection personnel, the Independent Assessment Panel concluded that "there were numerous instances in which MSHA's enforcement personnel exhibited a lack of understanding of MSHA's policies and procedures" and that "some interviews of MSHA supervisory

personnel suggested that at the time of the explosion, they were unaware of the inadequate quality of MSHA's enforcement performance at UBB."  IPA, at p. 4.

37.      MSHA itself decided that the lack of supervision of the District 4 inspectors who were responsible for inspecting the UBB mine was so egregious that it merited disciplinary action.  Upon information and belief, MSHA took disciplinary action against Kevin Stricklin (Administrator, Coal Mine Safety and Health), Charles J. Thomas (Deputy Administrator, Coal Mine Safety and Health), Donald Winston (Supervisory Mine Safety and Health Specialist), and Lincoln L. Selfe, Jr. (Supervisory Mine Safety and Health Inspector).

38.      Most instructive of the disciplinary actions taken were those against Mr. Winston and Mr. Self.

39.      In upholding Specification 2 of the disciplinary allegations against Mr. Winston, which addressed his alleged failure to require agency specialists to use specified checklists when reviewing roof control plans and revisions, the Deputy Assistant Secretary for Operations wrote that "Failure to carry out your official duties is one of the most serious infractions that can be committed *** If you are unable to enforce agency policies and follow National Office directives, the inspectorate may be held to a lower standard of quality work which could jeopardize the safety of the miners MSHA is tasked with protecting."

40.      Similarly, in upholding Specification 1 that Mr. Selfe failed "to provide adequate management oversight by ensuring that inspectors and supervisors ... reviewed potentially flagrant violations in accordance with the procedures established

by Procedure Instruction Letter (PIL) No. I08-III-02", the Deputy Assistant Secretary of

Operations wrote that

> One of your key responsibilities of your position is to evaluate the results
> of policy implementation within your area of enforcement responsibility.
> The Mt. Hope Field Office inspectors issued eight section 104(d)(2) orders
> for violations at UBB that met the 'numbered objective criteria' in PIL
> No. I08-III-02 for review as potentially flagrant violations.  The eight
> violations were not reviewed as potentially flagrant violations by
> inspectors or supervisors."

41.     Nor did the agency buy the excuse  "but everybody else is doing it too":

> Although, as you indicated … , there may be other districts in violation of the
> Agency polices and directives, you did not acknowledge responsibility for your
> role in implementing the flagrant violation procedures in your enforcement
> division.  Your statements that every other ADM in the country needs to be
> disciplined since you are being disciplined and MSHA is using the IR report as a
> "gotcha" does not indicate your acknowledgement that you could have carried out
> your duties better.  If other districts have deficiencies, you are responsible for
> District 4, and must be held accountable.

42.     Most disturbing, however, is the alleged complicity of MSHA inspectors

in the "advance notice" scheme at UBB.

43.     Specifically, in the most recent information reviewed by Plaintiff, it was

learned that Stanley Stewart, a UBB employee at the time of the explosion, gave several

statements to the Federal Bureau of Investigation.

44.     In his January 30, 2015 interview, the following statements were attributed

to Mr. Stewart regarding rock dusting, or the lack thereof, at UBB and the complicity of

"inspectors" regarding same:

> STEWART [sic] advised that Massey did not want to spend money on outby
> labor.  STEWART saw areas that were black and without any rock dust.
> STEWART would take rock dust and throw in areas where inspectors would be
> traveling.  STEWART advised that some inspectors would tell operators where
> they would be traveling.  STEWART stated that the inspector would tip off their
> buddies where they were traveling.

45.     That account compares interestingly to an account given the FBI by Mr. Andy Coalson, a UBB employee who acknowledged involvement in the "advance notice" program:

> Coalson stated that he never had an inspector tell him not to call underground. It didn't feel like a law because no one ever enforced it. It was only enforced on mine blitzes. Coalson's take was that the law was on the books, but it was never enforced.

## COUNT I – NEGLIGENCE AND WRONGFUL DEATH

46.     Paragraphs 1 through 45 are incorporated by reference as if set forth fully herein.

47.     Per the Supreme Court of Appeals of West Virginia, "The ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised. The test is, would the ordinary man in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?" *Sewell v. Gregory*, 179 W.Va. 585, 371 S.E.2d 82, Syl. Pt. 3 (1988).

48.     Additionally, "A private inspector who inspects a work premises for the purpose of furthering the safety of employees who work on said premises owes a duty of care to those employees to conduct inspections with ordinary skill, care, and diligence commensurate with that rendered by members of his or her profession." *Bragg v. United States*, 230 W.Va. 532, 741 S.E. 2d 90, Syl. Pt. 4 (2013).

49.     By analogy, the United States is liable here for negligently executing a duty it undertook, and for failing to exercise reasonable care to prevent harm to the Plaintiff caused by the United States' affirmative negligent conduct.

50.    The United States voluntarily, specifically, physically, and actually undertook a duty to render inspection and other services to the miners at the UBB Mine, including Mr. Davis.

51.    The United States undertook the duty to perform thorough, detailed, and regular inspections of active underground mines such as the UBB Mine at prescribed intervals, in order to enforce compliance with generally accepted safety and health standards.

52.    The United States recognized or should have recognized that the careful rendering of those services was necessary for the protection of the miners, including Mr. Davis, and that performing those services in a negligent manner could lead to serious injury or death of the miners.

53.    The Plaintiff reasonably relied upon the United States to undertake its inspections and other activities in a competent and non-negligent manner, and that reliance ultimately contributed to the wrongful death of Mr. Davis.

54.    The United States breached its duties to Mr. Davis by failing to inspect and/or report numerous blatant, fundamental, and grave violations of generally accepted coal mine safety standards, as described above, and as detailed in MSHA's own internal investigation of its actions preceding the fatal explosion at the UBB Mine.

55.    These acts and/or omissions were a breach of the United States' duties to the Plaintiff under West Virginia law, which, as the Fourth Circuit has noted, includes the factors of "the likelihood of injury, the magnitude of the burden of guarding against it, and the consequences of placing that burden" on a defendant, and which factors "weigh in favor of finding that a safety inspector owes a duty of care to the employees whose

safety the inspection is intended to secure.' *Bragg v. United States*, __ S.E.2d __, 2013 WL 490776, at *10 (W. Va. Feb. 5, 2013) (quotation marks omitted). The court plainly "h[e]ld that a private inspector who inspects a work premises for the purpose of furthering the safety of employees who work on said premises owes a duty of care to those employees to conduct inspections with ordinary skill, care, and diligence commensurate with that rendered by members of his or her profession." *Bragg v. United States*, No.11-1342 (4th Cir. June 11, 2013).

55.    The United States, by its acts and/or omissions, failed to exercise reasonable care in performing and rendering services to the Plaintiff, resulting in the death of Mr. Davis.

56.    The United States' failure to exercise reasonable care in carrying out its inspection and other activities increased the Plaintiff's risk of harm, and the United States thereafter failed to take reasonable steps to prevent harm to the Plaintiff resulting from its negligent affirmative acts.

57.    The United States' acts and/or omissions were the proximate cause of and/or a substantial contributing factor in causing the Plaintiff's damages.

58.    As a direct result of the United States' tortious acts and/or omissions in these matters, the Plaintiff's decedent suffered death, pain, impairment, and metal anguish, and the decedent's Estate suffered losses as set forth in West Virginia's Wrongful Death Act, West Virginia Code §§ 55-7-6(c)(1) and (2).

WHEREFORE, Plaintiff asks for a judgment against Defendant in an amount in excess of $75,000, as well as any other relief to which she is entitled.

Respectfully submitted,


*/Alicia Schmitt/*
Bruce E. Stanley (WVSB No. 5434)
Alicia M. Schmitt (WVSB No. 12333)
Stanley & Schmitt PC
2424 Craftmont Avenue
Pittsburgh, PA 15205
T: (412) 401-4654
bruce@stanleyschmittlaw.com
alicia@stanleyschmittlaw.com

*Attorneys for Plaintiff*

Dated:  July 10, 2018

## CERTIFICATE OF SERVICE

I, Alicia Schmitt, counsel for Plaintiff, hereby certify that on July 10, 2018, I electronically filed the foregoing AMENDED COMPLAINT with the Clerk of the Court via electronic mail, which will provide notification to the following CM/ECF participants:

Fred B. Westfall, Jr., Esquire
Assistant United States Attorney
P.O. Box 1713
Charleston, WV  25326
*Counsel for Defendant*


_____/Alicia Schmitt/_____
Alicia M. Schmitt, Esquire
Stanley & Schmitt PC
2424 Craftmont Avenue
Pittsburgh, PA 15205
Phone: (412) 212-3065
Fax: (412) 265-6015
Email:  alicia@stanleyschmittlaw.com

*Counsel for Plaintiff*

# EXHIBIT A

**U.S. Department of Labor**          Office of the Solicitor
                                      Washington, D.C. 20210

                                         Suite S-4325
                                    200 Constitution Ave., NW
                                     Phone:  (202) 693-5320
                                      Fax:  (202) 693-5374

October 19, 2017

## CERTIFIED MAIL-RETURN RECEIPT REQUESTED

Carolyn D. Davis, as Administratrix for
the Estate of Charles Timothy Davis
221 Delung Lane
Scarbro, West Virginia 25917

Re:  Tort Claim of Carolyn Davis, as Administratrix for the Estate of Charles Timothy Davis

Dear Mrs. Davis:

This letter responds to the administrative claim you filed with the United States Department of Labor
(DOL) on behalf of the Estate of Charles Timothy Davis seeking 7.5 million dollars in damages for the
death of your husband at the Upper Big Branch Mine on April 5, 2010. This office has carefully
reviewed this administrative claim, filed pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §
2671 *et seq.* and for the reasons stated below, this review discloses no liability on the part of the United
States. Your claim, filed as Administratrix of the Estate of Charles Timothy Davis, is therefore denied.

A well-established principle of law is that the United State cannot be sued; this is commonly referred to
as sovereign immunity.  However, the United States can waive this immunity from suit by statute, as
under the FTCA.  This waiver of sovereign immunity under the FTCA is a limited waiver that is subject
to numerous exceptions. In addition, liability of the United States under the FTCA is based on whether a
private person in like circumstances would be liable under the applicable state law. 28 U.S.C. § 1346(b).
"Sovereign immunity is jurisdictional in nature.  Indeed, the 'terms of [the United States'] consent to be
sued in any court define that court's jurisdiction to entertain the suit.'"  *F.D.I.C. v. Meyer*, 510 U.S. 471,
475 (1994). *See United States v. Kubrick*, 444 U.S. 111, 117-18 (1979); *United States v. Orleans*, 425
U.S. 807, 813 (1976).

As stated above, the basis for FTCA liability is *state* law.  Violation of a *federal* law cannot be the basis
for FTCA liability.  *F.D.I.C. v Myer*, 510 U.S. 471 (1994).  The FTCA does not waive the sovereign
immunity of the United States to allow tort claims based on alleged violations of federal statutes or
regulations. *See Williams v. United States*, 242 F.3d 169, 173 (4th Cir. 2001);  *United States v.
Agronics, Inc.*, 164 F.3d 1343, 1346 (10th Cir. 1999); *Sea Air Shuttle Corp. v. United States*, 112 F.3d
532, 536 (1st Cir. 1997); *Art Metal–U.S.A., Inc. v. United States*, 753 F.2d 1151, (D.C. Cir. 1985).  To
the extent that your administrative claim is based on allegations that the Mine Safety and Health
Administration (MSHA) failed to perform actions mandated by federal statutes, regulations or
procedures, there is no liability under the FTCA, and thus, your claim is denied.

Your claim is also denied based upon the Discretionary Function exception to the FTCA. In passing the FTCA, "Congress was careful to except from the Act's broad waiver of immunity several important classes of tort claims," which would otherwise fall within section 1346(b)'s reach. *United States v. Varig Airlines*, 467 U.S. 797, 808 (1984). One of the exceptions to the FTCA's surrender of sovereign immunity is the Discretionary Function exception which bars "any claim...based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). If the Discretionary Function exception applies, the claim does not fall within the FTCA's waiver of sovereign immunity, and federal courts lack jurisdiction to entertain the claim. *Estate of Bernaldes v. United States*, 81 F. 3d 428 (4th Cir. 1996).

The government's actions in inspecting the Upper Big Branch Mine South, and in identifying, recording or correcting any hazards, met the required elements found in the Mine Safety and Health Act of 1977 (Mine Act), 30 U.S.C. § 801 *et seq.* Under the Mine Act, the Secretary is required to make inspections of each underground mine "in its entirety at least four times a year." 30 U.S.C. § 813(a). Although you assert negligent inspections, inspectors who were inexperienced, and inadequate training of MSHA employees, you have not specifically stated any mandatory duty regarding inspection, or training of MSHA inspectors, that has been violated. There is no dispute that MSHA conducted the requisite inspections. The manner of the inspection; choosing which inspectors to inspect the mine; the manner and sufficiency of those inspectors' training; and judgments made by the inspectors during the inspection fall within the FTCA's Discretionary Function exception, even if MSHA "clearly should have known" of the hazards as alleged in your claim. 28 U.S.C. § 2680(a). The federal government's actions in training its employees and in inspecting the UBB mine required it to exercise considerable discretion in order to balance a number of important and potentially conflicting policy considerations. Those actions involved human judgment in determining how best to train the inspectors to determine whether safety violations exist; the policy considerations of maintaining the health and safety of the workers at the UBB mine; and utilizing the limited governmental resources available to the agency and its inspectors in conducting the inspections. These types of governmental actions are the types of governmental functions that the Discretionary Function exception was designed to protect from suit. *See generally Estate of Bernaldes v. United States*, 81 F. 3d 428 (4th Cir. 1996). The Discretionary Function exception applies "whether or not the discretion involved be abused." 28 U.S.C. §2680(a); *Dalehite v. United States*, 346 U.S. 15, 33-34 (1953).

Finally, your claim is denied because the Government's alleged negligence has not created a cause of action under the state law of West Virginia. *See generally Bragg v. United States,* 230 W. Va. 532, 741 S.E. 2d 90 (2013). As previously stated, the basis for FTCA liability is *state* law. West Virginia has long held that for negligence to be actionable it "must be the proximate cause of the injury complained of and must be such as might have been reasonably expected to produce an injury." *McCoy v. Cohen*, 149 W. Va. 197. 140 S.E.2d 427 (1965); *Barbina v. Curry*, 221 W. Va. 41, 650 S.E.2d 140 (2007). Under West Virginia law, "the proximate cause of an injury is the last negligent act contributing to the injury and without which the injury would not have occurred. *Sergent* v. *City of Charleston*, 209 W. Va. 437, 549 S.E. 2d 311, 320 (2001); *Judy v. Grant County Health Dept*, 210 W. Va. 286, 557 S.E.2d 340 (2001). Although a "tortfeasor whose negligence is a substantial factor in bringing about injuries is not

2

relieved from liability by the intervening acts of third persons if those acts were reasonably foreseeable by the original tortfeasor at the time of his negligent conduct," *Anderson v. Moulder*, 183 W.Va. 77 (1990), "[g]enerally a willful, malicious, or criminal act breaks the chain of causation." *Yourtee* v. *Hubbard*, 196 W. Va. 683, 690 (1990); *Sergent* at 321. In this case, I find that criminal acts committed by Massey's Don Blankenship break the chain of causation.On December 3, 2015, Don Blankenship was convicted of conspiracy to willfully violate MSHA standards. On January 19, 2017, the Fourth Circuit affirmed the District Court's decision. *United States of America v. Blankenship*, 846 F. 3d. 663 (4th Cir. 2017) *cert denied* 583 U.S.___. The Fourth Circuit noted that Blankenship's conviction stemmed from his conspiring to violate, among other regulations, "(1) mine ventilation regulations, (2) mine-safety examination requirements, (3) regulations regarding support of roof and walls, and (4) regulations governing accumulation of explosive coal dust." *Id.* at 668. The Court noted that despite MSHA issuing many citations to UBB in 2009 and 2010, "including some related to improper ventilation and accumulation of combustible materials – problems that were key contributing factors to the accident ...[Blankenship] told...Massey employee in charge of the Upper Big Branch mine that 'safety violations were the cost of doing business' and that it was 'cheaper to break the safety laws and pay the fines than to spend what would be necessary to follow the safety laws.'" *Id.* at 666-667.

The Mine Act places responsibility for compliance with health and safety regulations upon the mine operator. *See* 30 U.S.C. § 801(e). The Act provides that "the operators of such mines with the assistance of the miners have the primary responsibility to prevent the existence of [unsafe] conditions and practices in such mines." *Id.* Even though MSHA regularly (as required by the statute) inspected the UBB mine for compliance with MSHA rules and to promote a safe working mine, Blankenship intentionally worked to thwart MSHA's efforts. Blankenship was aware – due to MSHA inspections and many resultant citations - that unsafe conditions existed that were key contributing factors to the accident, but he chose to run his mine ignoring the Mine Act and its implementing regulations/procedures. Instead of working with MSHA, his instructions to Massey employees demonstrate intentional non-compliance to increase profits by ignoring MSHA rules. Consequently, to the extent that Massey's actions at the UBB mine rose to the level of criminal conduct, as demonstrated by Blankenship's conviction, any chain of causation due to MSHA's alleged negligence in its inspections was broken. Under the FTCA (analyzing the applicable law of West Virginia), MSHA's actions were not the proximate cause of Charles Timothy Davis' death.

With respect to this denial under the FTCA, you are advised of your right to file suit in an appropriate United States District Court within six months of the date of the mailing of this letter if you are dissatisfied with the results of this determination.

Sincerely,

CATHERINE P. CARTER
Counsel for Claims and Compensation

3